IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Joseph J. Shulte, | ) | C/A No.: 1:19-3009-BHH-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | REPORT AND |
| | ) | RECOMMENDATION |
| Andrew M. Saul, Commissioner of | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pro se pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Disability Insurance Benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

## I.    Relevant Background

### A.    Procedural History

On September 27, 2017, Plaintiff protectively filed an application for DIB in which he alleged his disability began on September 1, 2014. Tr. at 342–50. His application was denied initially and upon reconsideration. Tr. at 279–82, 287–91. On January 10, 2019, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Tammy Georgian. Tr. at 177–93 (Hr'g Tr.). The ALJ issued an unfavorable decision on January 25, 2019, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 154–76. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 5–10. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on October 23, 2019. [ECF No. 1].

### B.    Plaintiff's Background and Medical History

#### 1.    Background

Plaintiff was 48 years old at the time of the hearing. Tr. at 177, 344. He completed college. Tr. at 182. His past relevant work ("PRW") was as an aircraft mechanic, aircraft assembler, and inspector/auditor. Tr. at 190–91. He alleges he has been unable to work since September 1, 2014. Tr. at 344.

2.    Medical History[1]

a.    Records Submitted Prior to ALJ Hearing

The record contains an undated "Wrist Conditions Disability Benefits Questionnaire," that was completed by an unidentified medical provider.[2] Tr. at 798–805. The provider indicated Plaintiff sustained bilateral wrist strains in 1995 that resulted in constant pain he rated as a four of 10. Tr. at 798–99. Plaintiff reported flare-ups that occurred 10 to 15 times per month and required use of wrist splints. *Id.* The provider noted palmar flexion to 70/80 degrees and dorsiflexion to 65/70 degrees. Tr. at 799–800. He recognized functional loss impairment of the wrists. Tr. at 801. He recorded 5/5 strength to bilateral wrist flexion and extension. Tr. at 802. He denied that degenerative or traumatic arthritis had been documented through diagnostic testing. Tr. at 804. He recognized Plaintiff's report that his condition impacted his ability to work to the extent it was aggravated by "using a screwdriver and writing." Tr. at 805.

A rating decision from the Department of Veterans Affairs ("VA") dated January 4, 2012, reflects Plaintiff's impairment rating for lumbar facet

---

[1] The record contains multiple missing pages and pages that are out of order. For example, pages 850–859 of the record contain notes from a 95-page record, but the pages are 27, 30, 33, 32, 35, 34, 37, 36, 39, and 38. The undersigned has summarized the record as well as it permits.
[2] Because pages appearing before and after this record were not included, it is impossible to discern the author of the questionnaire or the date it was completed.

3

sclerosis at L4–5 as 20%, degenerative disc disease ("DDD") of the cervical spine as 10%, tinnitus as 10%, and hypothyroidism and hypopituitarism as 10%, effective November 1, 2010. Tr. at 202–13.

Plaintiff participated in physical therapy for his lower back in early 2012. Tr. at 812–20.

On April 1, 2012, Susan J. Burditt, M.D. ("Dr. Burditt"), completed a sleep apnea questionnaire pursuant to a compensation and pension ("C&P") exam. Tr. at 754–57. She noted findings, signs, or symptoms attributable to Plaintiff's sleep apnea included insomnia, tiredness, and snoring. Tr. a 756. She indicated Plaintiff's sleep apnea affected his ability to work secondary to daily somnolence. Tr. at 757.

Plaintiff presented to Deena J. Flessas, M.D. ("Dr. Flessas"), for a mental health diagnostic assessment consultation on April 26, 2012. Tr. at 751. He reported chronic dysthymia, low energy, chronic fatigue, low self-esteem, difficulty making decisions, poor concentration, and a feeling of helplessness. *Id.* He indicated he did not work well in team settings and preferred to isolate and internalize stressors. *Id.* Dr. Flessas observed the following on a mental status exam ("MSE"): flat affect; no deficits in psychomotor activity; normal speech; depressed mood; denies hallucinations, delusions, and suicidal and homicidal ideations; tangential thought process; intact memory and orientation; sound judgment; and limited-to-poor insight.

4

Tr. at 753. She assessed dysthymia and a global assessment of functioning ("GAF")[3] score of 70.[4] Tr. at 754. She prescribed Sertraline for dysthymia and Bupropion for smoking cessation and referred Plaintiff for individual counseling to address external stressors and develop coping mechanisms. *Id.*

Plaintiff initiated individual counseling with Sondra R. Bryant, LMSW-CP ("SW Bryant"), on May 21, 2012. Tr. at 758. He complained of depression, social anxiety, and external stress and endorsed the following: chronic fatigue; difficulty making decisions; feeling of helplessness; isolative behavior; internalization of stressors; work-related stress; impaired concentration and memory; lack of social interaction; inability to express himself; poor self-image; procrastination; low energy and motivation; depressive mood; bottling of feelings; and increased stress related to difficulty understanding communication from others. *Id.* He noted his symptoms had lasted for several years and impacted the quality of his home and work life.

---

[3] The GAF scale is used to track clinical progress of individuals with respect to psychological, social, and occupational functioning. American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("*DSM-IV-TR*"). The GAF scale provides 10-point ranges of assessment based on symptom severity and level of functioning. *Id.* If an individual's symptom severity and level of functioning are discordant, the GAF score reflects the worse of the two. *Id.*

[4] A GAF score of 61–70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, [and] has some meaningful interpersonal relationships." *DSM-IV-TR.*

*Id.* SW Bryant described objectives and goals of cognitive behavioral therapy ("CBT"). Tr. at 759.

A VA rating decision dated June 21, 2012, reflects impairment ratings of 50% for sleep apnea, 20% for right shoulder strain, 20% for left shoulder strain, 10% for right wrist strain, and 10% for left wrist strain. Tr. at 217–20.

Plaintiff complained of increased conflict with his supervisor on November 20, 2012. Tr. at 763. He indicated he had applied for another position within the company to get away from his supervisor. *Id.* SW Bryant noted flat affect and "stressed" mood. Tr. at 764. She encouraged Plaintiff to use effective communication techniques, but Plaintiff indicated he did not think they would be useful given the circumstances. Tr. at 763.

On November 29, 2012, Plaintiff reported anhedonia, low energy, and poor sleep due to back pain. Tr. at 737. Ashley Tate Hatton, Psy.D. ("Dr. Hatton"), noted Plaintiff sat stiffly and shifted positions a few times, but maintained good eye contact. *Id.* She described Plaintiff's speech as monotone and hesitant at times. *Id.* She noted dysthymic mood and blunted affect, but linear thought process, normal memory and orientation, and intact judgment and insight. *Id.* She wrote:

> Veteran appears to have Social Phobia, generalized, with the one distinction that he believes his fears of rejection are realistic, which may be indicative of hypersensitivity to rejection which is characteristic of Avoidant Personality Disorder. Veteran noted having a number of traits found in Obsessive-Compulsive

Personality Disorder, such as devotion to work, preoccupation with the rules, difficulty delegating tasks, and rigidity. Because of the limited time provided this writer was unable to gather sufficient historical data to diagnose a personality disorder, but traits appear to be present.

Tr. at 738. She assessed generalized social phobia and history of dysthymia and indicated a need to rule out personality disorder. *Id.* She assessed a GAF score of 55[5] and recommended CBT. *Id.*

Plaintiff complained to Melissa M. Marshall, APN ("NP Marshall"), of worsening depression and unhappiness at work on October 11, 2013. Tr. at 1067. He felt that his suggestions as to safety issues and efforts to help his employer were being dismissed. *Id.* He endorsed low motivation, little pleasure in activities, frustration, vague depression, and mild sleep disturbance. *Id.*

On October 16, 2013, magnetic resonance imaging ("MRI") of Plaintiff's brain was unremarkable. Tr. at 635–38.

Plaintiff presented to Andrew P. Perry, M.D. ("Dr. Perry"), for a C&P follow up on December 20, 2013. Tr. at 730. Dr. Perry noted Plaintiff's diagnoses included generalized anxiety disorder ("GAD") and depressive disorder, not otherwise specified ("NOS"). Tr. at 732. He noted Plaintiff had

---

[5] A GAF score of 51–60 indicates "moderate symptoms (e.g., circumstantial speech and occasional panic attacks) OR moderate difficulty in social or occupational functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM-IV-TR.*

physical diagnoses, including sleep apnea, degenerative arthritis of the spine, lumbosacral or cervical strain, limited motion of both wrists and arms, and hypogonadism, that contributed to his persistent anxiety and periodic depression. *Id.* He opined that Plaintiff had "occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks, although generally functioning satisfactorily, with normal routine behavior, self-care and conversation." Tr. at 733. Plaintiff reported frequent anxiety while talking to supervisors and coworkers. Tr. at 734–35. He endorsed the following depressive symptoms: depressed mood; anxiety; chronic sleep impairment; mild memory loss, such as forgetting names, directions, or recent events; flattened affect; circumstantial, circumlocutory, or stereotyped speech; disturbances of motivation and mood; difficulty in establishing and maintaining effective work and social relationships; and difficulty in adapting to stressful circumstances, including work or a work-like setting. Tr. at 735. Dr. Perry noted Plaintiff was cooperative, had a flat affect, expressed himself clearly, and spoke in careful details. *Id.* He noted anxiety was disruptive to Plaintiff's communication with others at work and in social settings and was manifested by self-consciousness, problems finding the right words, his mind going blank, being unable to think on his feet, and losing his train of thought. Tr. at 736. He stated Plaintiff had frequent tension and worry about his

communication difficulties. *Id.* He indicated "[i]t may be that his chronic pain also contributes to his anxiety and mood rather than his 'emotional tension' contributing to his chronic pain." *Id.* He noted Plaintiff's score of 25 on the Beck Depression Inventory II was consistent with mild depression. *Id.*

On January 17, 2014, x-rays of Plaintiff's left knee were normal. Tr. at 633–34. A depression screen was positive. Tr. at 729–30. NP Marshall noted normal findings on MSE. Tr. at 772. She discontinued Celexa 20 mg and prescribed Effexor XR 75 mg, but indicated she would switch Plaintiff back to Celexa if the side effects were intolerable. Tr. at 772–73.

In a decision dated April 1, 2014, the VA increased Plaintiff's disability impairment rating for dysthymic disorder to 70% effective November 1, 2010. Tr. at 221. The VA assigned the 70% impairment rating based on: difficulty adapting to a work-like setting; difficulty adapting to stressful circumstances; difficulty adapting to work; circumlocutory speech; circumstantial speech; difficulty establishing and maintaining effective work and social relationships; disturbances of motivation and mood; flattened affect; occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks (although generally functioning satisfactorily, with routine behavior, self-care, and conversation normal); anxiety; chronic sleep impairment; depressed mood; forgetting directions; forgetting names; forgetting recent events; and

9

mild memory loss. Tr. at 222–23. The VA also increased Plaintiff's rating for hypothyroidism and hypopituitarism to 30% disabling. Tr. at 223.

Plaintiff complained of work stress and requested authorization for increased time away from work under the Family and Medical Leave Act ("FMLA") on April 18, 2014. Tr. at 747. Steven R. LaRowe, Ph.D. ("Dr. Larowe"), noted normal findings on MSE. Tr. at 748–49. He recommended two hours of therapy and counseling per week and suggested Plaintiff talk to his providers if he needed to justify more time for FMLA leave. Tr. at 748.

Plaintiff presented to SW Bryant on May 30, 2014. Tr. at 750. He complained of significant job-related stress and requested she authorize two weeks "off of work to de-escalate." *Id.* SW Bryant noted that she had not seen Plaintiff since October 2013 and recommended he discuss the matter with his current therapist. *Id.* Plaintiff indicated his current therapist lacked the appropriate credential to authorize leave under the FMLA, but admitted she could request an authorized provider sign off on the request. *Id.*

Plaintiff presented to cardiologist Donald E. Saunders, III, M.D. ("Dr. Saunders"), for a new patient evaluation on July 23, 2014. Tr. at 536. He complained of chest pain and palpitations and reported being under a lot of emotional stress. *Id.* Dr. Saunders noted normal findings on physical exam. Tr. at 536–37. He ordered a stress test, a thyroid function test, an

echocardiogram ("echo"), and a portable heart monitor and encouraged Plaintiff to stop smoking. Tr. at 537.

On August 5, 2014, Dr. Saunders indicated a stress test was negative by electrical and symptomatic criteria. Tr. at 534. An echo showed normal left ventricular size, wall thickness, and systolic function; no left ventricular wall motion abnormalities; normal left ventricular ejection fraction of 55–60%; and normal right ventricular size and function. Tr. at 540.

On October 1, 2014, Plaintiff presented to Paul Walck, PA ("PA Walck"), for a urology consultation. Tr. at 588. He endorsed incontinence, lower urinary tract symptoms ("LUTS"), and retention. *Id.* PA Walck's impressions were small left simple renal cyst and mild hepatic steatosis. Tr. at 592. He noted a bladder scan confirmed slow flow with complete emptying. *Id.* He changed Terazosin 5 mg to Tamsulosin 0.4 mg. *Id.* He indicated Plaintiff might consider cystoscopy and cystometrogram. Tr. at 592–93.

Plaintiff underwent cystoscopy on March 9, 2015. Tr. at 595–97. Austin R. Younger, M.D. ("Dr. Younger"), recommended Plaintiff modify his caffeine consumption, as his high caffeine intake might be interfering with sphincter relaxation and coordinated contraction. Tr. at 597.

On January 25, 2016, x-rays of Plaintiff's lumbar spine were unremarkable. Tr. at 626–27.

On February 11, 2016, x-rays of Plaintiff's cervical spine showed progressive C5–6 degenerative disc disease, retrolisthesis, and uncovertebral spurring associated with moderate bilateral neural foraminal narrowing. Tr. at 625–26.

On March 1, 2016, a bone mineral density scan showed normal bone mineral density of the lumbar spine and hips. Tr. at 624–25.

Plaintiff presented to Travis H. Turner, Ph.D. ("Dr. Turner"), for a neuropsychology consultation on March 15, 2016. Tr. at 583. He complained of poor concentration, communication difficulties, and high susceptibility to depression with difficulty refocusing to a task after interruption. Tr. at 583–84. He reported difficulty remaining on a single task and leaving tasks at various stages of incompletion. Tr. at 584. He said he often zoned out, had difficulty organizing thoughts, and lost his train of thought during conversations. *Id.* He described social anxiety that affected his functioning. *Id.* He indicated he felt tired on most days and that is mind was generally "sluggish." *Id.* He reported co-owning and operating a specialty lighting products store through Amazon and spending "the entire day working." *Id.* Dr. Turner noted Plaintiff's medical history was most notable for neuroendocrine conditions associated with empty sella syndrome, as well as sleep apnea. *Id.* He observed Plaintiff to demonstrate no unusual motor signs; to be well dressed and groomed; to demonstrate dysphoric mood; to have flat

facial affect; to show slow rate and minimal prosody of speech; to be anxious and somnolent; to have grossly intact auditory comprehension; to provide honest and forthcoming responses to questions; to be fully oriented; and to be friendly and cooperative. Tr. at 585. He noted "[s]everal embedded indices raised questions of variable engagement during testing," causing results that "might underestimate neurocognitive function" and were "interpreted with caution." Tr. at 585–86. He considered Plaintiff's focused attention and information processing speed to be in the low average range and his vigilance on brief and sustained attention to be within the average range. Tr. at 586. He noted Plaintiff's efficiency for divided attention was impaired. *Id.* He stated Plaintiff demonstrated good memory for recent and upcoming events. *Id.* Plaintiff's ability to recall verbal material was in the borderline range and his ability to recall visual material was in the low average range. *Id.* He demonstrated 100% retention over 15- to 20-minute delays. *Id.* He demonstrated fair insight, had impaired working memory, and had low-average to average psychomotor inhibition on a task of sustained attention. *Id.* He endorsed very mild depressive mood symptoms. *Id.* Overall, Dr. Turner noted mild deficits in working memory, attention, information processing speed, divided attention, and verbal learning and intact vigilance and visual memory. *Id.* He stated Plaintiff did not meet diagnostic criteria for attention deficit hyperactivity disorder ("ADHD") because his symptoms were not

present during childhood. *Id.* He indicated "sluggish cognitive tempo" appeared to capture Plaintiff's clinical presentation. Tr. at 587. He opined that the most probable etiology was a subclinical neurodevelopmental condition complicated by neuroendocrine disorder. *Id.* He recommended Plaintiff consult with his endocrinologist as to medication to increase focus and alertness. *Id.*

On March 30, 2016, an MRI of Plaintiff's cervical spine showed disc desiccation with no significant neuroforaminal or spinal canal narrowing at C2–3, C3–4, or C4–5; posterior disc osteophyte complex with severe bilateral neural foraminal stenosis and indentation of the ventral thecal sac with overall moderate spinal canal stenosis at C5–6, and normal discs with no significant neuroforaminal or spinal canal narrowing at C6–7 and C7–T1. Tr. at 621–23.

On August 3, 2016, John A. Glaser, M.D. ("Dr. Glaser"), reviewed the MRI of Plaintiff's cervical spine and noted that it showed "some degeneration with foraminal narrowing at C5–6 with mild neurocompression." Tr. at 583. He recommended nonoperative measures that included time, exercise, medication, and a possible referral to a pain clinic. *Id.* He indicated Plaintiff could reconsult him if conservative measures failed and he desired to proceed with surgery. *Id.*

Plaintiff presented to Jose Luis Mira, M.D. ("Dr. Mira"), for an endocrinology follow up visit on July 26, 2017. Tr. at 566. He denied complications from testosterone injections. Tr. at 567. He reported a roughly 40-pound weight loss from his prior visit secondary to reducing soda and sugar intake. *Id.* He complained of depression, anxiety, difficulty concentrating, and decreased energy. *Id.* Dr. Mira continued testosterone and Humatrope injections, increased Dessicated Armor Thyroid 3/4 grain to address impaired concentration, and advised Plaintiff to eat five-to-six small meals throughout the day and avoid carbohydrate-heavy meals to address reactive hypoglycemia. Tr. at 569.

On September 6, 2017, Benjamin Zamora, M.D. ("Dr. Zamora"), completed back conditions and shoulder and arm conditions disability benefits questionnaires pursuant to a C&P exam. Tr. at 554–66. Dr. Zamora noted Plaintiff had been diagnosed with facet sclerosis of the lumbar spine at L4–5. Tr. at 555. Plaintiff reported his pain was confined to his lower back with no radiation to his lower extremities. *Id.* Dr. Zamora stated x-rays of Plaintiff's lumbar spine showed some loss of disc height at L4–5 and likely at L5–S1 that was consistent with minimal DDD. *Id.* He indicated Plaintiff had denied flare-ups and functional loss or impairment of the back. *Id.* He recorded reduced range of motion ("ROM") with forward flexion to 60/90 degrees and extension to 25/30 degrees. *Id.* He observed evidence of pain on

exam, but denied that it contributed to functional loss. Tr. at 556. He stated there was no evidence of pain with weight bearing. *Id.* He indicated there was no objective evidence of localized tenderness or pain on palpation of the joints or soft tissue of the back. *Id.* He denied that Plaintiff had guarding or muscle spasm of the thoracolumbar spine. *Id.* He documented 5/5 strength to bilateral hip flexion, knee extension, ankle plantar flexion, ankle dorsiflexion, and great toe extension. Tr. at 557. He found Plaintiff had no muscle atrophy. *Id.* He noted Plaintiff had normal, 2+ deep tendon reflexes ("DTRs") in his bilateral knees and ankles. *Id.* He documented a normal sensory exam in Plaintiff's bilateral L2, L3–4, and L5 dermatomes. Tr. at 557–58. Dr. Zamora stated bilateral straight-leg raising ("SLR") tests were negative. Tr. at 558. He noted no signs of radiculopathy and no ankylosis of the spine. *Id.* He indicated Plaintiff did not ambulate with an assistive device. *Id.* He opined that Plaintiff's thoracolumbar spine condition would affect his ability to perform physical types of jobs. Tr. at 559.

Dr. Zamora noted that Plaintiff had been diagnosed with bilateral shoulder strains. Tr. at 560. He indicated x-rays of the bilateral shoulders were normal. *Id.* He observed reduced ROM to flexion of 110/180 degrees and abduction of 100/180 degrees in the right shoulder and flexion and abduction of 90/180 degrees in the left shoulder. Tr. at 561. He indicated ROM testing elicited pain, but did not contribute to functional loss. *Id.* He denied evidence

16

of localized tenderness, pain on palpation, crepitus, ankylosis, rotator cuff conditions, and shoulder instability. Tr. at 561, 563–64. He stated Plaintiff was able to perform repetitive use testing. Tr. at 561–62. He noted 5/5 bilateral shoulder strength to forward flexion and abduction. Tr. at 562. Dr. Zamora opined that Plaintiff's shoulder impairment would limit his ability to perform a physical type of job. Tr. at 566.

Plaintiff presented to Cashton B. Spivey, Ph.D. ("Dr. Spivey"), for a consultative psychological evaluation on January 10, 2018. Tr. at 822. He reported headaches and short-term memory deficits that caused him to misplace objects, forget to take medication, and forget elements of conversations. *Id.* He endorsed dysphoria secondary to social anxiety, sleep disturbance with middle-of-the-night awakenings, lower energy level, panic attacks, generalized anxiety, ruminations, and attention and concentration problems. Tr. at 822–23. He denied crying spells and auditory and visual hallucinations. *Id.* He reported driving, reading a newspaper, performing simple arithmetic, managing his own finances, washing dishes, doing laundry, cleaning his room, taking out the trash, shopping for groceries, using a computer for email and social media, and watching television. Tr. at 823. Dr. Spivey observed Plaintiff to be appropriately dressed and groomed and to be cooperative and compliant. *Id.* He noted Plaintiff scored 27 of 30 points on the Mini-Mental State Exam ("MMSE"), which was considered

within normal limits. *Id.* He indicated Plaintiff was unable to recall any of three objects at five minutes, which suggested some impairment to his short-term auditory memory functioning. *Id.* He stated Plaintiff was able to perform serial sevens, follow a three-step command, and accurately reproduce a drawing. *Id.* He noted Plaintiff demonstrated intact language skills, a satisfactory general fund of knowledge, intact abstract reasoning skills, normal psychomotor functioning, logical and coherent thought processes, and fair-to-good insight and judgment. *Id.* He estimated Plaintiff's general intelligence was in the average range. *Id.* He observed Plaintiff to have a sad mood, a blunted affect, fair attention/concentration, mildly-slowed speech, minimal eye contact, and mildly-reduced energy level. *Id.* Dr. Spivey assessed diagnoses of social anxiety disorder, unspecified depressive disorder, unspecified anxiety disorder, sleep apnea, and history of panic disorder. Tr. at 824. He considered Plaintiff capable of managing his own funds independently and accurately, understanding simple and complex instructions, and performing simple and complex tasks in the workplace. *Id.* He stated there did not appear to be any significant factors that would preclude Plaintiff's ability to relate well to others in the workplace, despite his reports of social anxiety. *Id.* He wrote: "Mr. Schulte believes he would have problems with stamina, persistence in the workplace due to his report of a low energy level, and attention/concentration problems. During this

evaluation, he did appear to display a mild reduction in his energy level and his attention/concentration functioning was fair." *Id.*

On January 11, 2018, state agency medical consultant Angela Saito, M.D. ("Dr. Saito"), reviewed the evidence and assessed Plaintiff's physical RFC as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; occasionally balance, stoop, kneel, crouch, crawl, reach overhead with the bilateral upper extremities, and climb ramps and stairs; and never climb ladders, ropes, or scaffolds. Tr. at 236–38.

Plaintiff presented to the urology clinic for follow up on January 16, 2018. Tr. at 1134. Amy Trolley, PA-C ("PA Trolley"), noted Plaintiff had a history of benign prostatic hyperplasia ("BPH") and LUTS with evidence on cystoscopy of moderate bilobar hypertrophy. *Id.* She noted normal findings on physical exam. Tr. at 1136. She indicated she would check into a Urolift procedure, but that Plaintiff should continue daily Cialis and delay surgery for as long as possible because of potential negative effects. *Id.*

On January 19, 2018, state agency consultant Michael Neboschick, Ph.D. ("Dr. Neboschick"), reviewed the evidence and considered Listings 12.02 for neurocognitive disorders, 12.04 for depressive, bipolar, and related disorders, and 12.06 for anxiety and obsessive-compulsive disorders. Tr. at

19

234–35. He concluded Plaintiff had only mild limitation in his abilities to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage himself. *Id.* He rated Plaintiff's mental impairments as non-severe. *Id.*

On January 30, 2018, Plaintiff reported he felt as if he could not communicate with others. Tr. at 879. He complained of being easily distracted. *Id.* Jeffrey A. Meyer, Ph.D. ("Dr. Meyer"), observed the following on MSE: restless psychomotor activity; appropriate appearance and behavior; poor eye contact; alert and oriented to person, place, time, and situation; stammering speech at times; appropriate affect with constricted range; dysphoric mood; logical and goal-directed thought process; no suicidal or homicidal ideations; no abnormal thought content, delusions, or hallucinations; grossly intact memory and cognition; and good judgment and insight. Tr. at 878. He assessed dysthymic disorder and social anxiety disorder and referred Plaintiff for CBT. *Id.*

Plaintiff reported his medication for hypogonadism, growth hormone deficiency, and hypothyroidism was effective on February 7, 2018. Tr. at 862. He endorsed a good energy level, but complained of depression and neuropathic pain. *Id.* A physical exam was normal. Tr. at 864. Elizabeth A. Bond, M.D. ("Dr. Bond"), continued Plaintiff's medications. *Id.*

Plaintiff also followed up with Curtis Lucas, Ph.D. ("Dr. Lucas"), on February 7, 2018. Tr. at 873. He complained of depression, social anxiety, difficulty focusing, self-isolation, and racing thoughts. *Id.* Dr. Lucas noted Plaintiff was extremely concerned about how he was perceived by others, which tended to contribute to his social anxiety. *Id.* He encouraged Plaintiff to be less harsh and judgmental of himself. Tr. at 872. He noted normal findings on MSE, aside from stuttered/broken speech, depressed and anxious mood, congruent affect, and fair judgment. *Id.*

Plaintiff discussed how he felt inadequate and immobilized by his anxiety on February 13, 2018. Tr. at 860. Dr. Lucas noted Plaintiff practiced avoidance strategies to cope with anxiety and subsequently berated himself for the limitations his avoidance imposed. *Id.* He encouraged Plaintiff to practice mindfulness exercises. *Id.* He observed Plaintiff to demonstrate stuttered/broken speech, depression and anxious mood, congruent affect, and fair judgment, but other findings on MSE were normal. Tr. at 860, 863.

On February 20, 2018, Plaintiff complained of worsened pain with activity and worsening anxiety, depression, and memory issues. Tr. at 853. He endorsed compliance with a continuous positive airway pressure ("CPAP") machine with good results. *Id.* He requested a referral for chiropractic treatment. *Id.* Lovorka P. Stojanov, M.D. ("Dr. Stojanov"), noted normal findings on physical exam, aside from lumbosacral spine pain on palpation

over the paraspinal muscle. Tr. at 854–55. She assessed pan-hypopituitarism status post-radiation exposure with mild neurocognitive disorder, chronic low back and neck pain, sleep apnea, history of shin splints, and social anxiety/depression and memory issues. Tr. at 855. She instructed Plaintiff to follow up with his endocrinologist, continue Meloxicam, add Tylenol as needed, continue use of CPAP, and use Voltaren cream. *Id.*

Plaintiff complained of increasing problems with focus, memory, and attention on February 27, 2018. Tr. at 945. Dr. Lucas observed normal findings on MSE, aside from stuttered/broken speech, anxious and depressed mood, congruent affect, circumstantial thought process, and fair insight and judgment. Tr. at 946.

On March 6, 2018, Plaintiff reported prior incidents that could have caused traumatic brain injury and complained that memory deficits were interfering with his relationship and impairing his abilities to work and develop new relationships. Tr. at 838. Dr. Lucas encouraged Plaintiff to work on coping strategies through therapy. *Id.* He observed normal findings on MSE, aside from stuttered/broken speech, depressed and anxious mood and affect, and fair insight and judgment. Tr. at 945.

On March 16, 2018, Kimberly Capers, R.N., declined Plaintiff's request for a chiropractic consultation. Tr. at 837. She advised Plaintiff to try acupuncture, physical therapy, or a pain clinic. *Id.*

22

Plaintiff discussed upcoming neuropsychological testing with Dr. Lucas on March 20, 2018. Tr. at 941. Dr. Lucas observed adequate appearance, no abnormal behavior or psychomotor activity, slightly stuttered/broken speech, cooperative attitude, anxious and depressed mood, congruent affect, no hallucinations, goal-directed thought process, no suicidal or homicidal ideations, no hallucinations or delusions, and fair insight and judgment. Tr. at 941–42.

Plaintiff presented to Megan G. Holcomb, Ph.D. ("Dr. Holcomb"), for a neuropsychology evaluation on March 26, 2018. Tr. at 911. He reported ongoing cognitive complaints and stated random thoughts caused him to become distracted and to be unable to complete tasks. Tr. at 912. He indicated he was unemployed, but was helping his partner to start a business. Tr. at 914. Dr. Holcomb observed Plaintiff to be alert, grossly oriented, and acceptably groomed. Tr. at 915. She noted dysphoric affect, no unusual psychomotor movements, limited social interaction, minimal eye contact, and normal rate of speech with low tone and volume. *Id.* She stated Plaintiff's auditory comprehension of test instructions was intact. *Id.* She noted his thought organization was not suggestive of psychotic process and his answers were on target. *Id.* She indicated he was circumstantial at times. *Id.* She stated Plaintiff put forth variable effort, leading her to conclude the "results [were] likely not an accurate portrayal of [his] current level of

23

neuropsychological functioning." *Id.* She further explained that Plaintiff gave sufficient effort on one embedded measure of effort, but gave insufficient effort on several standalone measures, performing "worse than the dementia population" on one measure. *Id.*

Plaintiff scored within the average range on a measure of fund of information. *Id.* His auditory attention and repetition of digit strings were average. *Id.* His processing speed was moderately impaired. *Id.* He showed some difficulty with inattention and impulsivity on a prolonged measure of visual attention, vigilance, and impulsivity. *Id.* He showed severely impaired performance on a speeded measure of divergent visuomotor sequencing. *Id.* He demonstrated severely impaired new learning for simple geometric shapes and their locations over three trials. Tr. at 916. He had intact basic language and communication abilities. *Id.*

Plaintiff provided consistent responses, resulting in the malingering scale not being activated on the personality assessment inventory. *Id.* His pattern of performance suggested considerable concerns about his physical functioning. Tr. at 917. Dr. Holcomb noted Plaintiff's results suggested a possible somatoform disorder. *Id.* Her impressions were rule out somatoform disorder, history of GAD, and history of social phobia. *Id.* She recommended Plaintiff follow up with Dr. Lucas, continue to adhere to his medication regimen, participate in evidence-based therapy, consider working with a

24

psychologist in the pain clinic, consider psychotropic medication, use his CPAP, quit using tobacco, and be as physically and mentally active as possible. Tr. at 917–18.

Plaintiff followed up with Dr. Lucas on March 28, 2018. Tr. at 937. He complained of anxiety and interpersonal challenges. *Id.* He expressed disappointment that the results of neuropsychological testing were considered invalid and explained that he might have been trying too hard or pressing too much to be accurate, causing a detrimental effect on the results. *Id.* Dr. Lucas noted soft and slightly stuttered speech, depressed and anxious mood, congruent affect, and fair insight and judgment, but normal psychomotor activity, appearance, attitude, thought process, and thought content. Tr. at 939.

Plaintiff followed up with Dr. Stojanov on April 3, 2018. Tr. at 1006. Dr. Stojanov informed Plaintiff that he was not a good candidate for the Urolift procedure because of his median lobe hypertrophy. *Id.* She recommended either transurethral resection of the prostate ("TURP") or photoselective vaporization of the prostate ("PVP"). *Id.* Plaintiff was reluctant to undergo surgery. Tr. at 1007. Dr. Stojanov recommended he follow up in one year and continue Cialis 5 mg daily. Tr. at 1008.

On April 4, 2018, state agency consultant, Jennifer Steadham, Ph.D. ("Dr. Steadham"), reviewed evidence as to Plaintiff's mental impairments and

reached the same conclusions as Dr. Neboschick. *Compare* Tr. at 234–35, *with* Tr. at 248–29.

On April 5, 2018, state agency medical consultant Mary Lang, M.D. ("Dr. Lang"), reviewed the record and assessed the same physical RFC as Dr. Saito. *Compare* Tr. at 236–38, *with* Tr. at 250–53. She reviewed the record for a second time on June 20, 2018, and again provided the same physical RFC assessment. *See* Tr. at 269–72.

Plaintiff presented to Marcelaine Haire, NP ("NP Haire"), for a pain assessment on April 6, 2018. Tr. at 1004. He indicated he was "here to jump through this hoop so I can go see a chiropractor." *Id.* He endorsed pain in his neck and back and left lateral lower arm paresthesia. *Id.* He described his sleep as poor. *Id.* He reported walking his dog for 20 to 30 minutes several times a week. *Id.* NP Haire observed full ROM of the neck with stiffness and discomfort at the end of ROM in axial rotation, tight bilateral bands of the spine, tenderness to palpation ("TTP") to the bilateral paracervical muscles, very limited lumbar ROM in forward and lateral flexion, full elbow ROM, intact sensation and grip strength in the left upper extremity, flat affect, and minimal eye contact. Tr. at 1005. She assessed chronic neck and back pain and instructed Plaintiff to use fish oil, trigger-point massage, stretching, and an anti-inflammatory diet. *Id.* She encouraged Plaintiff to try magnesium, use CPAP for sleep, start turmeric 2000 mg, and increase his physical

activity. *Id.* She administered acupuncture treatment. Tr. at 1006. NP Haire referred Plaintiff for a physical therapy consultation, but Plaintiff declined the appointment, as he did not think physical therapy would assist him with his problem. Tr. at 1190–91.

On April 10, 2018, Plaintiff discussed difficulties in his relationship. Tr. at 1002. Dr. Lucas observed slightly stuttered speech, anxious and depressed mood, congruent affect, and fair insight and judgment. Tr. at 1003–04.

Plaintiff attended therapy with Dr. Lucas on April 19, 2018. Tr. at 1000. He reported having purchased a cooking class for his partner, who did not receive the gift well. *Id.* Dr. Lucas noted slightly stuttered speech, depressed and anxious mood, congruent affect, racing thoughts at times, and fair insight and judgment. Tr. at 1001.

On April 19, 2018, Megan Mattos, Psy.D. ("Dr. Mattos"), issued a psychological evaluation report based on assessments on March 5, March 19, and April 4, 2018, clinical interviews, collateral interviews with Plaintiff's family, a review of records, the Life Events Checklist for DSM-5, Extended Version, and the North American Adult Reading Test ("NAART"). Tr. at 976. Plaintiff complained of poor concentration, attention, and memory. *Id.* He endorsed a history of head injuries and difficulty with interpersonal functioning, retaining thoughts for long enough to write them down, paying attention to events and details, remembering events, and completing tasks.

*Id.* He indicated he tried to avoid others and ruminated over what others thought of him. Tr. at 977. He stated his racing thoughts caused him to bounce from one topic to another in conversation. *Id.* He said he often avoided conflict and placed others' needs ahead of his own. *Id.* Plaintiff reported he assisted his partner in his business, but was unable to complete tasks in a timely manner and had difficulty due to chronic pain. Tr. at 978. He indicated he needed a work environment that was low pressure, allowed him to work at his own pace, and had few social demands. *Id.* Dr. Mattos observed Plaintiff to have difficulty expressing his thoughts and experiences; to appear to search for words; to demonstrate circumstantial speech in a low, flat tone; and to have a generally constricted affect. Tr. at 980.

Plaintiff endorsed the following symptoms of depression: feeling sad all day most days of the week; loss of interest and/or pleasure in activities previously enjoyed every day for over two years (i.e., photography, cars, drones) due to lack of confidence and motivation; increased appetite resulting in weight fluctuation; poor sleep resulting in delayed sleep onset and waking during the night; restlessness and feeling slowed down; feeling easily fatigued; feelings of guilt for not communicating his feelings and being reclusive; difficulty concentrating, resulting in inability to read for long periods and inability to follow conversations; difficulty making decisions; and poor self-esteem. *Id.* He reported anxiety related to social situations, his

health, others' perceptions of him, relationships with his family and partner, and his finances. Tr. at 980–81. He endorsed the following symptoms: being easily fatigued; poor concentration; irritability; disturbed sleep; and muscle tension. Tr. at 981. He complained of symptoms of ADHD that included: poor attention to detail and careless mistakes; difficulty sustaining attention to tasks; requiring things be repeated due to not listening when spoken to; failure to complete tasks; difficulty with organization; poor time management; avoidance of tasks requiring sustained mental effort; losing things; being easily distracted; forgetfulness; fidgeting; difficulty remaining seated; moderate difficulty engaging in quiet activities; difficulty waiting his turn; and interrupting or intruding. *Id.* Plaintiff's sister reported he had difficulty organizing his thoughts, interacting in relationships, and initiating social contact. *Id.*

Plaintiff's score on the NAART was consistent with average premorbid cognitive ability. Tr. at 983. Dr. Mattos indicated her interviews suggested Plaintiff likely had low-level of symptoms of ADHD that had worsened over time due to unaddressed trauma and insufficient treatment for anxiety. *Id.* She stated anxiety often manifested as ADHD and could magnify symptoms of ADHD. *Id.* She noted Plaintiff's anxiety caused loss of focus and concentration, distraction, increased restlessness, and impulsive decision making. *Id.* She indicated Plaintiff's depression and anxiety contributed to

difficulty maintaining attention to tasks like cleaning and reading and might create pressure to quickly write down thoughts to combat forgetfulness. *Id.* She stated Plaintiff's anxiety might decreased his focus in the moment. *Id.* She opined that Plaintiff's pain led to anxiety and depression and his anxiety and depression increased his physical pain. *Id.* Her diagnostic impressions were social anxiety, GAD, moderate persistent depressive disorder, unspecified neurodevelopmental disorder by history, and posttraumatic stress disorder ("PTSD"). Tr. at 984. She recommended the following with respect to planning Plaintiff's return to work: "a job that is low in pressure and social demands in an environment that is not fast paced and allows him to work at his own pace until psychiatric symptoms are sufficiently addressed"; "extensive social interactions are likely to fatigue [Plaintiff]" and "could decrease work production"; "a mentor or case worker" may provide support and help troubleshoot problems; avoid "jobs requiring extensive or prolonged mechanical work until [Plaintiff] completes sufficient treatment for his anxiety and the presence of PTSD is further evaluated"; and "[b]e aware that communication may be difficult for [Plaintiff] due to circumstantial speech and social anxiety." *Id.*

Plaintiff followed up with Dr. Lucas for therapy on April 25, 2018. Tr. at 998. Dr. Lucas noted slightly stuttered speech, depressed and anxious

mood, congruent affect, racing thoughts at times, and fair insight and judgment. Tr. at 999–1000.

On April 26, 2018, Plaintiff presented to Chantell R. McKee, M.D. ("Dr. McKee"), for an abscess on his buttocks. Tr. at 1323. A depression screen was positive. *Id.* Dr. McKee drained Plaintiff's abscess and packed and dressed the wound. Tr. at 1325.

Plaintiff presented for a wound check on April 30, 2018. Tr. at 1319. Dr. McKee noted Plaintiff's wound was healing well and instructed him to continue Bactrim and warm soaks as needed. Tr. at 1321.

Plaintiff reported chronic pain in his lower back, neck, and shoulders on May 7, 2018. Tr. at 994. NP Haire noted Plaintiff had a flat affect and poor eye contact. Tr. at 995. She observed TTP in the lower paraspinal muscles, poor lumbar ROM in flexion, stiffness, and indicated Plaintiff was barely able to flex at the waist. *Id.* She stated Plaintiff complained of bilateral shoulder pain at the onset of flexion and rotation, but was able to lie on his stomach with his arms out to his side without difficulty or discomfort and to bring his right arm into flexion without complaints of difficulty or discomfort. *Id.* NP Haire administered acupuncture. Tr. at 996.

Plaintiff also presented to Dr. Lucas for therapy on May 7, 2018. Tr. at 997. Dr. Lucas noted soft speech, depressed and anxious mood, congruent

affect, and fair insight and judgment. Tr. at 998. He encouraged Plaintiff to be more assertive with his partner. Tr. at 997.

On May 17, 2018, Plaintiff reported problems communicating with his partner. Tr. at 992–93. Dr. Lucas observed soft speech, anxious and depressed mood, congruent affect, and fair insight and judgment. Tr. at 993. He encouraged Plaintiff to ask directly for what he wanted in terms of activities and togetherness in his relationship. *Id.*

On June 7, 2018, Plaintiff reported frustration at his partner's unwillingness to attend a concert with him, but indicated his sister accompanied him instead. Tr. at 989. A depression screening was suggestive of mild depression. Tr. at 990–92. Dr. Lucas noted soft speech, depressed and anxious mood, congruent affect, and fair insight and judgment. Tr. at 990. He encouraged Plaintiff to try to avoid overthinking things, which tended to create additional stress. *Id.* He noted Plaintiff was starting to be more assertive with his partner. *Id.*

Plaintiff complained of relationship challenges on June 12, 2018. Tr. at 1246. Dr. Lucas observed normal findings on MSE, aside from depressed and anxious mood and affect and fair insight and judgment. Tr. at 1247. He noted Plaintiff had made some progress in communicating and was challenging himself and his partner to be clearer about their goals. Tr. at 1246. He

encouraged Plaintiff to attend group therapy, and Plaintiff agreed to consider it. Tr. at 1246–47.

Dr. Steadham reviewed additional evidence on June 19, 2018, considered Listings 12.04 and 12.06, and assessed a mild degree of impairment as to understanding, remembering, or applying information and adapting or managing oneself and a moderate degree of limitation as to interacting with others and concentrating, persisting, or maintaining pace. Tr. at 266–68. She indicated Plaintiff's impairments were severe, but did not "preclude the performance of simple, unskilled work w[ith] limited contact." Tr. at 268. She completed a mental RFC assessment, indicating moderate limitation as to the following abilities: to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to complete a normal workday and workweek without interruption from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Tr. at 272–74. In clarifying her response as to Plaintiff's ability to complete a normal workday and workweek, she wrote:

> He can attend to & perform simple, unskilled tasks for reasonable periods of time without special supervision, but may have difficulty sustaining concentration on complex tasks. He can attend work regularly, missing no more than an occasional day of work d/t his mental illness. Clmt will do best w/ reasonable, rather than pressured, production demands.

Tr. at 273.

Plaintiff followed up with PA Haire for acupuncture on June 20, 2018. Tr. at 1241. He complained of increasing left wrist pain, but denied wearing his wrist splint, as he was "too busy" to have his wrist immobilized. *Id.* PA Haire noted Plaintiff had a flat affect and poor eye contact. Tr. at 1243. She observed TTP to the lower paraspinal muscles, poor lumbar ROM in flexion, pain at onset of flexion and rotation of the bilateral shoulders, neck pain with any movement and with light touch to the sternocleidomastoid and trapezius, and full ROM and no neurological deficits to the neck. *Id.* She indicated Plaintiff barely flexed at the waist. *Id.* She performed acupuncture. Tr. at 1243–1245.

Plaintiff complained he could not focus and had difficulty retaining thoughts on July 12, 2018. Tr. at 1235. He reported trouble with sleep, energy, and interests. *Id.* Melanie T. Hatzis, M.D. ("Dr. Hatzis"), noted normal findings on MSE, aside from blunted affect. Tr. at 1239. She prescribed Duloxetine 30 mg for mood, anxiety, and chronic pain and

instructed Plaintiff to restart Melatonin for sleep and to continue therapy with Dr. Lucas. Tr. at 1240.

On July 24, 2018, Plaintiff reported increased stress from a recent family trip to New York and Toronto. Tr. at 1234. Dr. Lucas noted generally normal findings on MSE, aside from slightly soft speech, depressed and anxious mood and affect, and fair insight and judgment. Tr. at 1235.

On August 1, 2018, Plaintiff reported tolerating his endocrine medications well, but endorsed some generalized fatigue. Tr. at 1229. Dr. Bond noted normal findings on exam. Tr. at 1232. She continued Plaintiff's medications. *Id.*

Plaintiff continued to complain of communication problems with his partner on August 1, 2018. Tr. at 1228. Dr. Lucas noted normal findings on MSE, aside from slightly soft tone, depressed and anxious mood and affect, and fair insight and judgment. Tr. at 1228–29. He encouraged Plaintiff to work on expanding his comfort zone and being more assertive in his relationships. Tr. at 1228.

Plaintiff endorsed low motivation on August 20, 2018. Tr. at 1225. Dr. Lucas observed normal findings on MSE, aside from slightly soft speech, depressed and anxious mood and affect, and fair insight and judgment. Tr. at 1226. He recommended Plaintiff continue to work on setting boundaries in his primary relationship. Tr. at 1225.

Plaintiff rated his neck and bilateral shoulder pain as a four on August 29, 2018. Tr. at 1216. NP Haire observed Plaintiff to ambulate without difficulty, to have TTP in his bilateral trapezii, and to have full ROM of his cervical spine with complaints of tightness at end of ROM with bilateral head rotation. Tr. at 1222. She performed acupuncture. Tr. at 1222–23

Plaintiff presented to the physical therapy clinic to be fitted for bilateral wrist splints for bilateral wrist and right elbow pain on September 5, 2018. Tr. at 1186–87.

Plaintiff complained of increased frustration with his partner on September 6, 2018. Tr. at 1214. Dr. Lucas observed normal findings on MSE, aside from slightly soft speech, anxious mood and affect, and fair judgment. Tr. at 1213. He encouraged Plaintiff to find ways to deal with his partner's undesirable behaviors. Tr. at 1214.

Plaintiff reported having worked with his partner on hurricane planning during a session on September 18, 2018. Tr. at 1211. Dr. Lucas noted soft, but slightly improving speech, anxious mood and affect, fair insight and judgment, and otherwise normal findings on MSE. Tr. at 1212–13. He encouraged Plaintiff to work on exercises with his partner from the book he downloaded. Tr. at 1212.

Plaintiff complained of problems with communication and interpersonal dynamics involving his partner on October 10, 2018. Tr. at

1200. His score on a depression screen was suggestive of severe depression. Tr. at 1201–02. Dr. Lucas noted normal findings on MSE, aside from anxious mood and affect and fair insight and judgment. Tr. at 1200–01. He encouraged Plaintiff to acquire additional cognitive behavioral skills to address social anxiety and confrontational situations. Tr. at 1201.

Plaintiff also followed up with Dr. Hatzis on October 10, 2018. Tr. at 1203. He indicated he had not noticed much change in his mood and anxiety with the addition of Duloxetine. *Id.* He noted his sleep had improved to five to six-and-a-half hours with use of Melatonin. *Id.* He stated he had procrastinated on completing his business taxes, but eventually had them completed. *Id.* Dr. Hatzis noted normal findings on MSE, aside from blunted affect. Tr. at 1209. She agreed to increase Duloxetine from 30 to 60 mg for mood, anxiety, and chronic pain. Tr. at 1210. She instructed Plaintiff to continue individual therapy with Dr. Lucas and use of Melatonin for sleep. *Id.*

On October 26, 2018, Plaintiff reported increased stressors due to his dog's illness and veterinary expenses and a problem with his 150-gallon aquarium. Tr. at 1198. He indicated he was able to make contact with and convince his partner to sell several of the more expensive corals to a vendor. *Id.* Dr. Lucas noted Plaintiff was beginning to enhance some of his assertiveness and communication skills. *Id.* He observed slightly soft speech,

anxious mood, congruent affect, and fair insight and judgment, but otherwise normal findings on MSE. Tr. at 1199. He encouraged Plaintiff to continue to practice his assertiveness skills. *Id.*

Plaintiff complained of increased anxiety on November 13, 2018. Tr. at 1197. He reported difficulty dealing with home repair expenses related to the aquarium leak. *Id.* He indicated he and his partner were attempting to work together to salvage their coral and fish hobby, but continued to face interpersonal challenges. *Id.* Dr. Curtis observed Plaintiff to demonstrate slightly soft speech, anxious mood, congruent affect, and fair insight and judgment. Tr. at 1197–98. He encouraged Plaintiff to continue to practice assertiveness skills and to encourage his partner to be more engaged in their communication. Tr. at 1197.

Plaintiff followed up with NP Haire on November 14, 2018. Tr. at 1194. NP Haire observed Plaintiff to ambulate without difficulty, to have TTP of the bilateral trapezii, to sit in quadratus laborum stretch position without any difficulty or pain, to get in and out of an office chair with a lot of grimacing and some pain, and to swiftly get into a high pickup truck without difficulty. Tr. at 1196. Plaintiff declined acupuncture and dry needling and claimed the procedures increased his pain and muscle spasms. *Id.* NP Haire noted Plaintiff continued to smoke, was not exercising, was not using

Theracane daily, and had not attended any self-help classes. *Id.* She discharged him back to his primary care provider. *Id.*

> b.    Records Submitted to Appeals Council

On November 13, 2012, x-rays of Plaintiff's cervical spine showed moderate spondylosis at C5–6. Tr. at 32.

Plaintiff reported anxiety and sleep issues related to his back pain on December 3, 2018. Tr. at 151. He indicated he had recently spent nine days visiting his sister and her family in Rochester, New York. *Id.* He endorsed difficulty with communicating in confrontational situations. *Id.* Dr. Lucas noted Plaintiff had made some progress in enhancing his assertiveness in communication. *Id.* He documented normal findings on MSE, aside from slightly-soft speech, anxious mood, congruent affect, and fair insight and judgment. Tr. at 151–52. He encouraged Plaintiff to continue to practice interpersonal skill development. Tr. at 151.

Plaintiff complained of feeling stressed and overwhelmed by his family members' health conditions, communication problems with his partner, and difficulty dealing with his insurance company on December 17, 2018. Tr. at 148. Dr. Lucas observed depressed and anxious mood and fair insight and judgment, but indicated otherwise normal findings on MSE. Tr. at 149. He encouraged Plaintiff to use mindfulness practices to deal with his stressors. *Id.*

Plaintiff complained of right knee pain on January 7, 2019. Tr. at 133. Dawn C. Mills, MSN, ANP ("NP Mills"), noted normal findings on exam, including full ROM of all extremities, 2+ bilateral upper and lower deep tendon reflexes, no swelling or edema, and 5/5 strength and tone. Tr. at 136. She indicated x-rays were normal and stated she would order an MRI. *Id.* NP Mills advised Plaintiff against chiropractic manipulation of his neck due to his extensive arthritis. *Id.* She encouraged Plaintiff to take Diclofenac twice a day and offered a consultation for injections. Tr. at 136–37.

On January 8, 2019, Plaintiff reported Duloxetine improved his mood by 20%. Tr. at 118. He described feeling "very stressed out" over family drama during the holidays, having low motivation, finding it difficult to complete tasks like installing a Ring doorbell, and waking during the night with his mind racing. *Id.* Dr. Hatzis noted "slightly better" mood and blunted affect, but otherwise normal findings on exam. Tr. at 124. She increased Duloxetine from 60 to 90 mg for mood, anxiety, and chronic pain. Tr. at 125.

Plaintiff described difficulty dealing with his insurance company and communicating with his partner on January 8, 2019. Tr. at 116. Dr. Lucas observed the following on MSE: adequate appearance; normal behavior and psychomotor activity; normal rate and slightly soft tone of speech; cooperative and attentive attitude; depressed and anxious mood; congruent affect; no

hallucinations or delusions; linear and goal-directed thought process; no suicidal or homicidal ideation; and fair insight and judgment. Tr. at 117.

Plaintiff reported feeling stressed and anxious on January 30, 2019. Tr. at 114. Dr. Lucas observed the following on MSE: adequate appearance; normal behavior and psychomotor activity; normal rate and tone of speech; cooperative and attentive attitude; depressed and anxious mood; congruent affect; no hallucinations or delusions; linear and goal-directed thought process; no suicidal or homicidal ideation; and fair insight and judgment. Tr. at 115.

On February 13, 2019, Plaintiff complained of multiple stressors due to the aquarium leak and a denial of Social Security benefits. Tr. at 108. Dr. Lucas noted the following on MSE: adequate appearance; no abnormal behavior or psychomotor activity; normal rate and tone of speech; cooperative and attentive attitude; depressed and anxious mood; congruent affect; no hallucinations or delusions; linear and goal-directed thought process; no suicidal or homicidal ideation; and fair insight and judgment. Tr. at 109.

Plaintiff underwent electromyography ("EMG") and nerve conduction studies ("NCS") on February 21, 2019, that were minimally abnormal. Tr. at 37. They showed borderline ulnar slowing at the left elbow and a latency shift with ulnar inching at the elbow, consistent with mild neuropraxia of the

ulnar nerve at the left elbow, but indicated no evidence of cervical radiculopathy or other upper extremity neuropathy. *Id.*

On February 26, 2019, Plaintiff reported increased anxiety due to trying to figure out his physical and pain challenges. Tr. at 72. Dr. Lucas observed the following on MSE: adequate appearance; no behavioral/psychomotor abnormalities; normal rate and tone of speech; cooperative and attentive attitude; depressed and anxious mood; congruent affect; no hallucinations or delusions; linear and goal-directed thought process; no suicidal or homicidal ideation; and fair insight and judgment. *Id.*

On March 4, 2019, an MRI of Plaintiff's cervical spine showed severe bilateral neural foraminal stenosis at C5–6, secondary to degenerative change, but no significant spinal canal stenosis. Tr. at 49–50. The findings were consistent with findings on the March 30, 2016 MRI. *Id.* An MRI of Plaintiff's lumbar spine showed degenerative changes that resulted in moderate-to-severe bilateral neural foraminal narrowing at L4–5; a diffuse disc bulge with left paracentral and foraminal disc protrusion at L4–5 that minimally contacted the left L5 exiting nerve root; mild-to-moderate left neural foraminal narrowing at L5–S1; a tiny posterior annular fissure at the L5–S1 disc; and trace spinal canal stenosis at L4–5. Tr. at 56.

On March 7, 2019, Dr. Glaser reviewed Plaintiff's MRI results. Tr. at 78. He stated the MRI of the cervical spine did not correlate with ulnar-sided

symptoms. *Id.* He indicated the MRI of the lumbar spine would not correlate with anterior proximal pain in the legs and it would be perfectly reasonable to consider injections. *Id.*

Plaintiff presented to Harris Scott Slone, M.D. ("Dr. Slone"), for evaluation of right knee pain on March 11, 2019. Tr. at 85. He reported his symptoms began six months prior. *Id.* Plaintiff demonstrated left knee flexion from neutral to 135 degrees and symmetric ROM on the right. Tr. at 87. Dr. Slone noted quadriceps fatigue with SLR test, but otherwise normal findings. *Id.* He indicated signal in the posterior compartment of the right knee was consistent with a ganglion cyst. Tr. at 88. He recommended physical therapy and administered a cortisone injection. *Id.*

Plaintiff followed up with Dr. David Stickler, M.D. ("Dr. Stickler"), for numbness and tingling in his bilateral arms and legs on March 18, 2019. Tr. at 35. Dr. Stickler observed normal gait and tone, 5/5 strength in the bilateral upper and lower extremities; mild alteration in sensation in the left fourth and fifth fingers, 2+ and symmetrical reflexes in the bilateral upper and lower extremities, normal coordination, and a mild upper extremity tremor. *Id.* He noted EMG/NCS showed a very mild left ulnar neuropathy at the elbow. *Id.* He stated Plaintiff's tremor was consistent with essential tremor. *Id.* He prescribed Primodone. *Id.* Plaintiff requested completion of disability paperwork pertaining to his neck and back, but Dr. Stickler did not feel that

he could complete the paperwork or further evaluate the complaints. Tr. at 36.

Plaintiff returned to Dr. Mattos for another assessment on March 18, 2019, and Dr. Mattos issued a second report on March 22, 2019. Tr. at 26–28. Plaintiff requested Dr. Mattos evaluate him for PTSD, somatic disorder, and avoidant personality disorder. Tr. at 26. Dr. Mattos administered the Clinician-Administered PTSD Scale ("CAPS") for DSM-5 Past Month/Worst Month Version to determine the presence of PTSD symptoms. *Id.* Plaintiff reported a history of being robbed at gunpoint while working in a fast food restaurant. *Id.* He endorsed intrusive memories of the event, distressing dreams, becoming physically upset, avoidance of thoughts or feelings and external reminders related to the traumatic event, strong negative beliefs about himself and others, persistent negative emotional state, feelings of detachment or estrangement, hypervigilance, strong startle reaction, problems with concentration, sleep disturbance, and daily distress that impaired his ability to develop relationships. Tr. at 26–27. Dr. Mattos concluded Plaintiff met diagnostic criteria for PTSD, but did not meet diagnostic criteria for somatic symptom disorder or avoidant personality disorder. Tr. at 28. She diagnosed social anxiety, GAD, moderate persistent depressive disorder, unspecified neurodevelopmental disorder by history, and PTSD. *Id.*

Dr. Mattos completed a mental RFC assessment in which she noted Plaintiff's marked limitation as to the following abilities: to work in coordination with or proximity to others without being distracted by them; to make simple work-related decisions; to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and to be aware of normal hazards and take appropriate precautions. Tr. at 29–30. She rated Plaintiff as moderately limited with respect to the following abilities: to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to interact appropriately with the general public; to ask simple questions or request assistance; to accept instructions and respond appropriately to criticism from supervisors; and to respond appropriately to changes in the work setting. *Id.* She considered Plaintiff to have mild limitations in understanding and memory. Tr. at 31. She noted Plaintiff had difficulty performing activities within a schedule, demonstrating poor prioritization and time management. *Id.* She stated Plaintiff's social anxiety would likely affect his ability to work on a team or in close proximity to others. *Id.* She indicated Plaintiff might have difficulty making work-related decisions. *Id.*

She noted Plaintiff would likely require breaks in addition to normal work tolerances and might be absent more frequently because of increased anxiety and depression. *Id.*

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing, Plaintiff testified he lived with his partner, who was self-employed in the online retail sales business. Tr. at 181. He said they lived off his military retirement and VA disability, in addition to his partner's income. Tr. at 182. He denied receiving additional benefits. *Id.* He acknowledged having a driver's license and being able to drive. *Id.* He stated he earned a bachelor's degree in business administration. *Id.* He said he last worked at Boeing, where was hired as an assembler in 2011 and retained the assembler job title throughout his employment, despite having transitioned into a job as an inspector/auditor. *Id.* He said he retired from the military in November 2010, after working first as an aircraft mechanic and then as a satellite operator starting in 2007. Tr. at 183. Plaintiff testified he stopped working at Boeing due to his anxiety, depression, and communication problems. Tr. at 184. He said his verbal and written communication skills were very weak, especially when he was put on the spot or with supervisors or upper level management. *Id.* He said he requested leave under the FMLA

46

and had exhausted vacation time as earned to cope with his stress and anxiety associated with the job and his own social anxieties. *Id.*

Plaintiff reported taking Duloxetine for anxiety, depression, and pain, fish oil, thyroid medication, acid reflux medication, muscle relaxers, Tylenol, Serotine, turmeric, and Meloxicam for pain. Tr. at 184–85. He said he smoked a pack of cigarettes per day and drank with dinner and in social settings, but denied use of recreational drugs. Tr. at 185.

Plaintiff described a typical day as waking from an average of six hours of sleep or six hours in bed with at least one interruption to use the bathroom. *Id.* He said he would have coffee and research and order items needed to perform cleaning, laundry, and other household tasks. Tr. at 185–86. He described lacking motivation, having difficulty staying on task, and being easily distracted. Tr. at 186. He said he had problems finding the right words to get to the results he needed, which he found very frustrating. *Id.* As an example of a research project, he described having received a Ring doorbell for Christmas that did not fit the molding, so he had to come up with a flush mount for the siding, requiring specific measurements and dimensions to identify the specific model that he could order on the internet. *Id.* He denied engaging in outside activities and said he no longer engaged in his hobbies of photography and recreational drone flying after he totaled his

$2,000 drone when a blade flew off due to his error. Tr. at 186–87. He said he had a German shepherd. Tr. at 187.

In response to his counsel's questions, Plaintiff testified that his last job at Boeing was detailed, requiring he monitor compliance with Federal Aviation Administration ("FAA") regulations and Boeing's rules. Tr. at 187–88. He said he was no longer able to handle that type of work due to anxiety, difficulty staying on-task, and problems communicating with management and some floor employees. Tr. at 188. He described the side effects of his medications as including drowsiness, morning brain fog, frequent urination and diarrhea, chronic pain, nighttime awakenings to use the bathroom, difficulty expressing thoughts, and mind blanking. Tr. at 188. He described the following physical limitations that he said prevented him from working: difficulty standing and walking; joint pain, especially in his back, neck, shoulders, and wrists; and inability to lift more than 10 to 15 pounds. Tr. at 188–89. He estimated being able to walk 20 minutes before needing to stop and sitting for five minutes in one spot before needing to reposition. Tr. at 189.

Plaintiff said he went to the grocery store once or twice a week at the direction of his partner, who primarily handled the cooking. *Id.* He said he did not rely on his partner for directions on other things on a daily basis, but would set multiple reminders on his phone for appointments. *Id.*

b.    Vocational Expert Testimony

Vocational Expert ("VE") Thomas C. Neil reviewed the record and testified at the hearing. Tr. at 190–92. The VE categorized Plaintiff's PRW in the Air Force as an aircraft mechanic as medium, skilled, specific vocational preparation ("SVP") of 7, *Dictionary of Occupational Titles* ("*DOT*") number 621.281-014. Tr. at 190–91. He classified Plaintiff's PRW with Boeing as an aircraft assembler as medium, skilled, SVP of 7, *DOT* number 621.281-014, and an inspector/auditor as medium, skilled, SVP of 7, *DOT* number 806.261-030. Tr. at 191.

The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform light work requiring he frequently sit, stand, and walk; occasionally climb ramps and stairs; never climb ladders, ropes, and scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; occasionally reach overhead with the bilateral upper extremities; perform and sustain simple tasks not at a production rate pace; and have occasional superficial contact with coworkers and the general public. Tr. at 191–92. The VE testified the hypothetical individual could not perform Plaintiff's PRW. *Id.* The ALJ asked whether there were any other jobs in the economy that the hypothetical person could perform. *Id.* The VE identified the following positions with an SVP of 2: garment bagger, *DOT* number 920.687-018; hand presser, *DOT* number 363.684-018; and housekeeping cleaner, *DOT* number

49

323.687-014, with 17,000, 12,000, and 210,000 positions available nationally,

respectively. Tr. at 192.

### 2. The ALJ's Findings

In her decision, the ALJ made the following findings of fact and

conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2019.
2. The claimant has not engaged in substantial gainful activity since September 1, 2014, the alleged onset date (20 CFR 404.1571 *et seq.*).
3. The claimant has the following severe combination of impairments: cervical degenerative disc disease (DDD), depression, and unspecified anxiety disorder (20 CFR 404.1520(c)).
4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform less than the full range of light work[2] as defined in 20 CFR 404.1567(b) except that he can never climb ladders, ropes, or scaffolds. The claimant can perform other postural activities occasionally. The claimant can frequently sit, stand, and walk. He can reach overhead occasionally with his bilateral upper extremities. The claimant can perform and sustain simple tasks, but not at a production rate pace. He can have occasional, superficial, contact with coworkers and the general public.
6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).
7. The claimant was born on September 4, 1971, and was 42 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563).
8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from September 1, 2014, through the date of this decision (20 CFR 404.1520(g)).

Fn2: Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds, as well as sitting, standing, or walking for 6 hours each in an 8-hour workday. The claimant can push and pull as much as he can lift and carry.

Tr. at 159–70.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons[6]:

---

[6] Plaintiff claims the ALJ erred in declining to find that his impairments met Listings 1.04, 12.04, 12.06, and 12.15. [ECF No. 36 at 42–45, 46]. Although he sets forth the criteria to meet the listings, he does not explain how the evidence satisfies the requirements of each listing. As Plaintiff declined to present a specific argument, the undersigned considers it unnecessary to explicitly address every factor under each of the four listings. Nevertheless, the undersigned has compared the criteria under each listing to the evidence as set forth above and finds the ALJ's conclusion that Plaintiff did not meet a listing to be supported by substantial evidence for the reasons she provided. *See* Tr. at 160–62. Although the ALJ did not specifically address Listing 12.15, she considered the same paragraph B criteria under Listings 12.04 and 12.06, Tr. at 160–62, and substantial evidence supports her conclusion that Plaintiff did not have extreme limitation in one or marked limitation in two of the broad areas of mental functioning, as required to meet Listings 12.04, 12.06, and 12.15. Substantial evidence also supports the ALJ's conclusion

1)  the ALJ failed to properly evaluate his subjective allegations;

2)  the ALJ did not adequately evaluate the medical opinions of record; and

3)  the ALJ did not sustain her burden as to the availability of jobs in the economy.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

---

that Plaintiff's DDD did not meet Listing 1.04, as the record contains no evidence of spinal arachnoiditis, lumbar spinal stenosis resulting in pseudoclaudication and inability to ambulate effectively, or nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, and motor loss accompanied by sensory or reflex loss. *See, e.g.*, Tr. at 35, 136, 557–58.

Plaintiff also maintains the ALJ did not consider all the relevant evidence and cites treatment records that were not included in the record before the court, which he purports to have attached to his brief. [ECF No. 36 at 53–54]. However, Plaintiff did not attach any additional records to his brief. *See* ECF No. 36. Prior to Plaintiff's filing of his brief, the undersigned denied his request for a third extension of time to file supporting evidence, ECF No. 33, noting the court does not consider additional evidence in Social Security appeals. [ECF No. 34]. Nevertheless, given the undersigned's recommendation for remand, Plaintiff may submit this evidence after the case is remanded to the agency.

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[7] (4)

---

[7] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

whether such impairment prevents claimant from performing PRW;[8] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the economy. To satisfy that

---

[8] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold

the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that his conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Subjective Allegations

Plaintiff argues the ALJ discredited his alleged symptoms based solely on the objective medical evidence. [ECF No. 36 at 45]. He maintains the record contains ample objective evidence to support his allegations. *Id.* at 46–49. He contends that, contrary to the ALJ's assertion, he received care for DDD of the cervical spine, having received medications and participated in acupuncture and chiropractic treatment. *Id.* at 46–47. He claims the ALJ considered his activities of daily living ("ADLs") without considering his qualifying statements as to his ability to perform them or explaining how

they supported a finding that he could engage in full-time employment. *Id.* at 49–52. He maintains the ALJ did not question him about these activities, but interpreted references in the record out of context. [ECF No. 38 at 1, 5].

The Commissioner argues the ALJ properly evaluated Plaintiff's subjective complaints. [ECF No. 37 at 6]. He maintains the ALJ relied on Plaintiff' statements to his physicians and a wide range of reported activities, in addition to the objective evidence, to evaluate his subjective allegations. *Id.* at 7–9.

"[A]n ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms." *Lewis v. Berryhill*, 858 F.3d 858, 865–66 (4th Cir. 2017) (citing 20 C.F.R. § 404.1529(b), (c)). "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms." *Id.* at 866 (citing 20 C.F.R. § 404.1529(b)). The ALJ only proceeds to the second step if the claimant's impairments could reasonably produce the symptoms he alleges. *Id.* At the second step, the ALJ is required to "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit [his] ability to perform basic work activities." *Id.* (citing 20 C.F.R. § 404.1529(c)). She must "evaluate whether the [claimant's] statements are consistent with objective medical evidence and the other evidence." SSR 16-3p, 2016 WL 1119029, at *6. However, she is not to evaluate the claimant's

symptoms "based solely on objective medical evidence unless that objective medical evidence supports a finding that the individual is disabled." *Id.* at \*4. The ALJ is to consider other evidence that "includes statements from the individual, medical sources, and any other sources that might have information about the individual's symptoms, including agency personnel, as well as the factors set forth in [the] regulations." *Id.* at \*5; *see also* 20 C.F.R. § 404.1529(c) (listing factors to consider, such as ADLs; the location, duration, frequency, and intensity of pain or other symptoms; any measures other than treatment an individual uses or has used to relieve pain or other symptoms; and any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms).

Pursuant to SSR 16-3p, the ALJ must explain which of the claimant's symptoms she found "consistent or inconsistent with the evidence in [the] record and how [her] evaluation of the individual's symptoms led to [her] conclusions." SSR 16-3p, 2016 WL 1119029, at \*8. "An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding." *Lewis*, 858 F.3d at 869 (quoting *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010)). She must evaluate the "individual's symptoms considering all the evidence in his or her record." SSR 16-3p, 2016 WL 1119029, at \*8.

In engaging in the analysis pursuant to 20 C.F.R. § 404.1529, the ALJ found Plaintiff's medically-determinable impairments could reasonably be expected to cause some of the symptoms he alleged, but concluded his statements were not entirely consistent with the medical and other evidence of record. Tr. at 163.

Contrary to Plaintiff's assertion and in accordance with 20 C.F.R. § 404.1529(c) and SSR 16-3p, the ALJ considered more than the objective medical findings in assessing his subjective allegations as to the effect of his impairments. The ALJ acknowledged Plaintiff's allegations of difficulty remembering, following instructions, paying attention, engaging in social activities, getting along with others, dealing appropriately with authority, spending time in crowds, concentrating, focusing, completing tasks, avoiding distractions, handling change, and managing his mood. Tr. at 160. However, she noted Plaintiff's reported abilities to prepare meals, go to doctor's appointments, take medications, shop, drive, read, provide information about his health, describe his prior work history, follow instructions from healthcare providers, comply with treatment outside of a doctor's office or hospital, respond to questions from medical providers, shop, spend time with friends and family, watch television, manage funds, use the internet, handle his own medical care, maintain self-care and personal hygiene, care for pets, take care of his aquarium, and get along with caregivers. Tr. at 160–61. She

further observed that Plaintiff's medical providers described him as pleasant and cooperative, that he had good interactions with non-medical staff, and that he was generally observed to have appropriate grooming and hygiene. Tr. at 161. She indicated Plaintiff was able to complete testing that assessed concentration and focus. *Id.*

The ALJ further considered Plaintiff's ADLs, noting he admitted to performing the majority of the cleaning and laundry and shopping for groceries, despite his reports of difficulty with motivation and staying on task. Tr. at 163. She wrote: "Notably, while the claimant continued to complain[] of an inability to focus, he continued to drive, reported doing his business taxes, was able to use his computer, and remained independent in his activities of daily living (Exhibit 7F, 8F, 10F, 13F)." Tr. at 165. The ALJ was particularly swayed by Plaintiff's ability to operate a vehicle, noting "it is difficult to reconcile the fact that claimant operates a motor vehicle" with his allegation that his "functional abilities are severely limited." Tr. at 166. She stated "[t]he operation of a motor vehicle is a very dynamic task in a changing environment that is largely influenced by the driver" and "requires the making of continuous decisions/judgment calls," "social interaction, and the ability to multitask while dealing with external and internal stimuli." *Id.* She referenced Plaintiff's report to Dr. Lucas that he was helping his partner start a business. Tr. at 165. She acknowledged that Plaintiff "was battling

with his insurance company over home repairs, secondary to the leak of his 150-gallon aquarium" and was working with his partner "as they navigated salvaging their coral and fish hobby, which they highly valued." Tr. at 166.

The ALJ further summarized and discussed Plaintiff's subjective allegations as follows:

> He is easily distracted, yet he is able to drive. The claimant alleged that he had word finding problems; however, VA records dated as recently as March 2018, note that his basic language and communication abilities were intact during the interview (Exhibit 10F/29). The claimant said that when he becomes frustrated he moves on to something else. He uses the internet. He used to enjoy recreational drone flying. The claimant has a German shepherd. Functionally, the claimant claims that he cannot lift more than 10–15 pounds. He has pain in all his joints, back, neck, shoulders, and wrists. He said that he has pain with standing and walking. The claimant testified that he could not walk more than 20 minutes. He said that he could only sit for five minutes, despite sit[t]ing longer during the hearing.

Tr. at 163. She explained:

> The claimant's activities of daily living are inconsistent with his allegations of such significant functional limitations, but are fully consistent with the residual functional capacity described above. The evidence of record indicates that despite the claimant's complaints and allegations, he has admitted that he was able to live with his partner, bathe and dress himself, cook, shop, drive, wash laundry, do projects around his house, assist his partner with his business, use his computer, engage in online social media, clean, take care of his dog and aquarium, and do his business taxes, activities, which generally reveal functioning at a greater level than alleged (Exhibits 7E, 5F, 13F). Of note, his exacting descriptions of his daily activities are representative of an active lifestyle and are not indicative of a significant restriction of activities or constriction of interests.

Tr. at 166.

The ALJ considered measures Plaintiff used to reduce symptoms. She noted that he participated in regular mental health care, but generally had unremarkable MSEs. Tr. at 161. She recounted his testimony that he was prescribed Duloxetine for anxiety and depression and that his dose was increased three days prior to the hearing. Tr. at 162–63. She acknowledged his report of taking fish oil, medications for his thyroid and acid reflux, turmeric, and Meloxicam. Tr. at 163. She noted Plaintiff's testimony as to side effects from medication that included "drowsiness, urination, nighttime awakenings to go to the bathroom, as well as not being able to come up with his thoughts." *Id.* She indicated Plaintiff had participated in physical therapy in January 2012 for low back pain and had received a transcutaneous nerve stimulation ("TENS") unit, but reported not using it consistently because he did not want to grow dependent on it. *Id.*

The ALJ considered the objective findings. She cited an unremarkable MRI of the brain in October 2016, an MRI of the cervical spine that showed degeneration and narrowing, normal endocrine lab work in January 2017, negative SLR and gait in February 2018, multiple generally unremarkable MSEs, and a score of 27/30 on the MMSE. Tr. at 164.

The ALJ considered the treating and consultative medical providers' statements and impressions. She noted Dr. Turner assessed Plaintiff as

having "mild deficits on tests of attention, information processing, and verbal learning that were consistent with his subjective sense of poor concentration and mental sluggishness." Tr. at 164. She referenced Dr. Stojanov's impression that Plaintiff "had a strong focus on his physical and psychological limitations with a degree of self-judgment and frustration" and frequently used the word "can't." *Id.* She noted Dr. Lucas assessed only "mild" cognitive deficits. *Id.* She cited Dr. Holcomb's assessment of Plaintiff's efforts as "insufficient" and producing invalid results on neuropsychological testing, as well as her impression that the psychological assessment suggested possible somatoform disorder. Tr. at 165.  She pointed out that Dr. Lucas indicated, despite the stressors of dealing with his insurance company and trying to salvage his coral and fish hobby, Plaintiff "did not appear to be overwhelmed." Tr. at 166. She cited NP Haire's November 2018 impression that Plaintiff "got in/out of the office chair with a lot of grimacing and some groaning," but was "swiftly getting into a high pick-up truck without difficulty upon leaving (Exhibit 14F)." *Id.* She considered Dr. Spivey's opinion that Plaintiff "was capable of understanding simple and complex instructions, as well as performing simple and complex tasks in the workplace" and that "there were no significant factors that would preclude his ability to relate well to others in the workplace," despite his report of social anxiety. Tr. at 167. She noted Dr. Mattos's recommendation that Plaintiff have "a low

pressure and low socially demanding job, with no fast pace work" and her notation that "communication may be difficult" due to circumstantial speech and social anxiety." *Id.* However, she further noted VA records from March 2018 indicated Plaintiff had intact basic language and communication abilities during the interview. *Id.*

The ALJ also specifically considered a letter from Plaintiff's sister, describing his activities and limitations. Tr. at 168.

The ALJ indicated she considered the "cumulative effect" of Plaintiff's severe and non-severe impairments on his ability to work, but concluded they did not preclude Plaintiff from sustaining consistent function within the confines of the RFC assessment. Tr. at 162. She concluded as follows:

> In sum, the above residual functional capacity assessment is supported by the evidence of record. Notably, the claimant's complaints appear vastly out of proportion to the objective findings. He has had essentially no care for his DDD. Moreover, his allegations of memory issues are not fully supported by the objective evidence of record and contrary to his vast array of activities he partakes in, including helping his partner with his business, doing his business taxes, composing lengthy exacting messages to his health care provider, and his ability to do various projects around his home. No treating source has limited the claimant's activity in any way. Notably, the claimant's healthcare providers consistently encouraged him to remain as physically and mentally active as possible. In March 2016, the claimant reported that he worked from home, noting that he generally spent the entire day working (Exhibit 2F). Accordingly, a finding that the claimant was incapable of all work activity is not supported by the evidence of record as a whole, for the reasons explained above.

Tr. at 168.

The undersigned finds no merit in Plaintiff's contention that the ALJ did not adequately consider his ADLs and interpreted notations in the record out of context and without further exploring them through testimony. The ALJ cited copious examples of Plaintiff's activities and functional abilities that demonstrated his abilities to complete routine and complex tasks and appropriately interact with others with whom he was familiar. If the ALJ had considered Plaintiff to have no restrictions, his argument would be supported. However, the ALJ conceded that Plaintiff had limitations that were significant enough to preclude the type of work he performed in the past. Tr. at 168. She found Plaintiff was physically limited to a reduced range of light work that required he occasionally perform most postural activities and reach overhead with his upper extremities; frequently sit, stand, and walk; and did not require he climb ladders, ropes, or scaffolds. *See* Tr. at 162. She considered the evidence, to include Plaintiff's ADLs, as supporting his ability to sustain simple tasks, but not at production rate pace, and to have occasional, superficial contact with coworkers and the general public.

Although Plaintiff disagrees with the ALJ's characterization of his treatment for cervical DDD as reflecting "essentially no care," she generally summarized the care Plaintiff received, noting his participation in physical therapy in January 2012, his refusal to use a TENS unit consistently, his use

of Meloxicam and Tylenol for back pain, a referral to a chiropractor, and his declining of an offer for medication assistance. Tr. at 163, 164. However, the ALJ's decision does not reflect her recognition of the acupuncture Plaintiff received.

Although the ALJ cited many valid reasons to support her assessment of Plaintiff's subjective allegations, the undersigned is constrained to find she did not thoroughly evaluate evidence as to Plaintiff's potential time off-task. Plaintiff points out the record contains opinion evidence that supports his allegations as to impaired work attendance and time off task. [ECF No. 38 at 5–6]. Dr. Perry opined that Plaintiff had "occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks, although generally functioning satisfactorily." Tr. at 733. Dr. Spivey did not specifically concede that Plaintiff would be off-task, but noted Plaintiff "believe[d] he would have problems with stamina, persistence in the workplace due to his report of a low energy level, and attention/concentration problems" and recognized that during the evaluation, "he did appear to display a mild reduction in his energy level and his attention/concentration functioning was fair." Tr. at 824. Tr. at 984. Dr. Mattos recommended Plaintiff consider work that "allows him to work at his own pace" and did not require "extensive social interactions," which were likely to fatigue" him and "decrease work production." Tr. at 984.

Dr. Steadham assessed moderate limitation in Plaintiff's abilities to perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, complete a normal workday and workweek without interruption from psychologically-based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods. Tr. at 272–74. She recognized that Plaintiff might miss "no more than an occasional day of work [due to] his mental illness." Tr. at 273.

The ALJ assessed moderate limitations in Plaintiff's ability to concentrate, persist, or maintain pace. Tr. at 161. Evaluation of a claimant's ability to concentrate, persist, or maintain pace requires consideration of his "abilities to focus attention on work activities and stay on task at a sustained rate." 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00(E)(3). In *Mascio v. Colvin*, 780 F.3d 632, 638 (4th Cir. 2015), the court "agree[d] with other circuits that an ALJ does not account for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work." It recognized that an ALJ might find that a claimant's moderate concentration, persistence, or pace limitation did not affect his ability to work, but indicated the ALJ would need to explain such a finding. *Id.*; *see also Sipple v. Colvin*, C/A No. 8:15-1961-MBS-JDA, 2016 WL 441841, at *9 (D.S.C. July 29, 2016), adopted by 2016 WL 4379555 (D.S.C. Aug. 17, 2016) ("After *Mascio*, further explanation and/or consideration is

necessary regarding how Plaintiff's moderate limitation in concentration, persistence, or pace does or does not translate into a limitation in his RFC.").

Because the record contains evidence that arguably supports a finding that Plaintiff had impaired ability to remain on task and to comply with normal attendance standards, the ALJ should have addressed that evidence and made a specific finding of fact as to how often Plaintiff's impairments would cause him to miss work and be off-task. *See* SSR 16-3p, 2016 WL 1119029, at *7 (providing the ALJ must explain how any material inconsistencies or ambiguities in the record were resolved). On remand, the ALJ may conclude Plaintiff's impairments would rarely or never cause him to be off-task or miss work and cite evidence to support such a finding, but in the absence of such an explanation, the court is left with unresolved evidence as to a potential impediment to employment. Remand is appropriate given the ALJ's "fail[ure] to assess [Plaintiff's] capacity to perform relevant functions, despite contradictory evidence in the record." *See Mascio*, 780 F.3d at 636.

### 2. Additional Allegations of Error

Plaintiff argues the ALJ erred in her evaluation of opinions from Drs. Perry, Mattos, Holcomb, Turner, Lucas, Hatzis, Hatton, and other physicians and inappropriately credited the opinions of the non-examining state agency consultants. [ECF No. 36 at 53–60]. He maintains the Appeals Council

should have remanded the case based on Dr. Mattos's second opinion, which served as new and material evidence. [ECF No. 38 at 2–3]. He contends the ALJ did not carry her burden at step five because she relied on jobs the VE identified in response to a hypothetical question that did not include all of his limitations as supported by his testimony and his physicians' opinions. [ECF No. 36 at 60–61].

The undersigned declines to address Plaintiff's additional allegations of error given the recommendation for remand.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

September 16, 2020                           Shiva V. Hodges
Columbia, South Carolina                    United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).